UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

PHILIP JOHN VALENTI, III,       )
                                )
        Plaintiff,              )
                                )
        v.                      )       CAUSE NO. 1:12-CV-00348
                                )
CAROLYN W. COLVIN,[1]           )
Acting Commissioner of Social Security,  )
                                )
        Defendant.              )

## OPINION AND ORDER

Plaintiff Philip John Valenti, III, appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Valenti applied for DIB in October 2009, alleging disability as of December 31, 2006, the

date he was last insured for DIB. (Tr. 23, 33, 129-31.)  Accordingly, Valenti must establish that

he was disabled as of December 31, 2006. *See Allord v. Astrue*, 631 F.3d 411, 413 (7th Cir.

2011) (explaining that a claimant must establish that he was disabled as of his date last insured in

order to recover DIB benefits).

The Commissioner denied Valenti's application initially and upon reconsideration, and

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013.  As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

Valenti requested an administrative hearing. (Tr. 33, 95-96, 104-05.)  On December 16, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Terry Miller, at which Valenti, who appeared *pro se*, and a vocational expert, testified. (Tr. 38-94.)  On January 7, 2011, the ALJ rendered an unfavorable decision to Valenti, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform his past relevant work as an office manager, as well as a significant number of other jobs in the economy. (Tr. 23-33.)  The Appeals Council denied his request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 7-17.)

Valenti, proceeding *pro se*, filed a complaint with this Court on October 4, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In his opening brief, Valenti argues that the ALJ: (1) did not obtain a valid waiver of counsel and failed to fully and fairly develop the record; (2) improperly discounted the February 2010 opinion of his treating physician, Dr. Jones; (3) improperly considered his daily living activities when determining the credibility of his subjective complaints; (4) erred by failing to include hand and finger limitations in the residual functional capacity ("RFC") assessment; and (5) and erred at step five by citing an insignificant number of representative jobs. (Docket # 29.)  After filing his opening brief, Valenti obtained counsel. (Docket # 22.)  In his two-page reply brief, Valenti advanced only his first argument—that the ALJ failed to adequately develop the record. (Docket # 35.)

## II.  FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Valenti was forty-five years old (Tr. 95); had obtained an associates degree in criminal justice in 2009 through online education (Tr. 54); and possessed

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 697-page administrative record necessary to the decision.

past work experience as a builder and assembler, press operator, picker, and office manager (Tr. 190-98). He alleges that he is disabled primarily due to pain in his neck, low back, shoulders, and knees; bilateral carpal tunnel syndrome; and headaches. (Tr. 50-52, 58, 61-74, 179.)

## A. *Valenti's Testimony at the Hearing*

Valenti testified that he lives in a one-story home with his wife, who is employed, and his fifteen-month-old grandson. (Tr. 49-50, 55.) Valenti's daily routine includes performing some household tasks such as loading the dishwasher and doing laundry; walking the dog; playing with his grandson; and working on the computer, including pursuing an online degree, managing household finances, and following political news. (Tr. 75, 83-87.) He drove himself the fifty-four miles to the hearing, stopping once to stretch. (Tr. 52-53.)

Valenti attributed most of his medical problems to a fall from a ladder in 1993 while serving in the Navy (Tr. 52, 63, 68); he receives disability benefits from the Veteran's Administration ("VA") based on a fifty percent impairment rating (Tr. 54). He wears bilateral knee braces for an anterior cruciate ligament injury incurred from the fall and bilateral wrist splints for carpal tunnel syndrome. (Tr. 50-52.) He complained of constant back pain, rating it between "six" and "ten" on a ten-point scale, and neck pain, ranging from "five" to "eight." (Tr. 62, 65-66.) He rated his right knee pain as a "constant six" and his left knee pain as a "three," but stated that it could flare higher based upon his activity level. (Tr. 70.) He also reported that his hands "go numb like the pins and needles sensation" due to his carpal tunnel syndrome. (Tr. 68.) In addition, he suffers from insomnia, sleeping only two hours a night, and gets migraine headaches every week or two. (Tr. 62, 71-72, 81-82.) Valenti takes various medications for his pain, including Vicodin, Hydrocodone, muscle relaxers, and anti-inflammatories. (Tr. 73-74.)

Valenti estimated that as of his date last insured he could walk twenty minutes at a time, and he alternated between sitting and standing every two hours. (Tr. 75-77.) He climbs stairs, provided he holds the handrail, takes them one at a time, and steps straight forward. (Tr. 80.) He estimated that he could lift up to ten pounds, but he cannot perform any overhead reaching; he also has some difficulty reaching for objects in front of him. (Tr. 78-79.) He stated that he has always lacked good manual dexterity, yet he can pick up keys and can also pick up a hairpin from a table if he wets the tip of his finger; finally, he has no difficulty turning door knobs or picking up his grandson. (Tr. 79-80.)

### B. Summary of the Relevant Medical Evidence and Valenti's Work History Prior to December 31, 2006, His Date Last Insured[4]

Valenti was released from the Navy in April 1993, after he fell from a ladder. (Tr. 380.) He injured both knees in the fall and suffered shoulder and elbow contusions and a lumbosacral spine strain. (Tr. 380.) He was treated with rest and pain medication. (Tr. 380.) He was then medically discharged from the Navy and eventually given a fifty percent disability rating by the VA. (Tr. 163, 383.)

In March 1999, Valenti was seen for chronic problems with his right knee and shoulder. (Tr. 93.) He also complained of occasional headaches. (Tr. 93.) Upon examination, Valenti's right knee showed no swelling, redness, or limitation of motion. (Tr. 94.) He was diagnosed with right knee pain and instructed to wear a knee brace and take Tylenol as needed for pain. (Tr. 94.) He was also encouraged to stop smoking and increase his physical activity. (Tr. 94.) In September 1999, Valenti was again counseled to quit smoking. (Tr. 90-92.)

---

[4] Other than the reviews performed by the state agency doctors, all of the medical evidence cited herein took place at various VA locations.

From 1994 to 2006, with the exception of a one year period from late 2001 to late 2002, Valenti worked full-time in various manufacturing, food distribution, construction, and freight transportation jobs. (Tr. 189-203.)

### C. Summary of the Relevant Medical Evidence and Valenti's Work History After December 31, 2006, His Date Last Insured

In February 2007, Valenti visited a VA physician and reported chronic pain in his right knee, as well as some stiffness, swelling, and instability. (Tr. 382-83.) He stated that although he wears a knee brace and is cautious when performing activities, he still has weekly flare-ups that limit his mobility. (Tr. 383-84.) He had not seen a physician in "quite some time" because of a lack of insurance and was taking over-the-counter ibuprofen for flare-ups. (Tr. 383-84.) Valenti reported that the pain had spread to his hips, left knee, and low back. (Tr. 384.) A clinical exam revealed an antalgic gait protecting the right leg, some slight tenderness to palpation of his hips, and some bilateral joint tenderness and crepitus in his knees. (Tr. 385-86.) He was diagnosed with degenerative changes of the right knee with collateral pain and joint changes in the right hip, left hip, and left knee. (Tr. 386.)

In July 2007, Valenti complained of a flare-up of pain in his lumbosacral spine when bending and lifting, and pain in his left shoulder and elbow upon repetitive motion or lifting heavy objects. (Tr. 380.) His recreational activities were affected by the pain, but not his activities of daily living. (Tr. 380-81.) Upon physical exam, Valenti demonstrated full shoulder range of motion, but some pain that increased with repetitive motion; he had full elbow range of motion without pain. (Tr. 381.) An x-ray of his left shoulder was unremarkable, negative for any arthritic changes (Tr. 381, 574); he did, however, have some osteoarthritis of his right shoulder (Tr. 572). He was diagnosed with a strain and contusion of his left shoulder and elbow with no

functional impairment. (Tr. 381.)  The physician noted that Valenti had not been followed by any physician for his complaints and there were no records of any examination or treatment after his release from active duty. (Tr. 381.)  Valenti was taking only over-the-counter medication for occasional pain. (Tr. 381.)

Valenti also underwent a clinical exam of his spine in July 2007, which revealed full range of motion, but some mild pain with lumbosacral flexion. (Tr. 378.)  Valenti's pain increased with repetitive motion of his lumbosacral spine, but it did not radiate to his lower extremities. (Tr. 378.)  A straight leg raise test was negative; he could walk on heels and toes. (Tr. 378-79.)  He limped, however, due to his right knee condition. (Tr. 379.)  He was diagnosed with a strain of the lumbosacral spine with chronic pain and mild degenerative changes. (Tr. 379, 573.)  Valenti was taking over-the-counter ibuprofen for pain during flare-ups. (Tr. 379.)  The doctor noted that although Valenti had not been followed for his back pain, it was "at least as likely as not" that the injury occurred during his 1993 fall. (Tr. 379.)

In January 2008, Valenti complained of constant pain in his neck, left shoulder, and arm, describing it as a "five" that could escalate to "ten." (Tr. 444.)  He also reported decreased upper extremity sensation. (Tr. 445.)

In February 2008, Valenti asked Dr. Michael Jones to write a letter "indicating that [he] is disabled and unable to perform any type of work for at least [one] full year." (Tr. 437.)  Accordingly, Dr. Jones penned a letter "to whom it may concern" stating that Valenti "suffers from multiple musculoskeletal conditions that sever[e]ly limit his ability to perform or obtain gainful employment," including cervical stenosis causing numbness in his upper extremities, a lumbar strain causing significant pain and limited mobility, limited range of motion in his

forearm, and chronic knee pain. (Tr. 435-36.)  Dr. Jones opined that "these conditions obviously limit[] [Valenti] from many occupations" and were expected to "only continue to deteriorate over [Valenti's] lifetime rather than improve either through surgery or other modes of therapy." (Tr. 436.)

A spinal MRI in early 2008 revealed some cervical stenosis, spondylitic changes of the lumbar spine, and a foraminal extrusion with impingement upon the exiting L4 nerve. (Tr. 325, 349, 564-66.)  An evaluation noted knee, shoulder, neck, and low back pain. (Tr. 325, 374.)  He reported multiple areas of pain, but particularly constant pain and numbness in his arms that radiated from his neck. (Tr. 438-39.)  Valenti was prescribed Vicodin. (Tr. 326.)  In March 2008, Valenti complained of neck pain and bilateral upper extremity numbness extending into his hands and fingers ant that it was worse on his right side. (Tr. 343-46.)  The pain occurred at all times of the day and woke him at night; he had no arm pain or weakness. (Tr. 343.)  He was diagnosed with neck pain and probable right carpal tunnel syndrome and referred to physical therapy. (Tr. 346-47.)

In April 2008, Valenti was diagnosed with severe right carpal tunnel syndrome. (Tr. 335.)  At a physical therapy visit, he complained of chronic hip, shoulder, back, neck, and bilateral knee and arm pain, together with arm numbness. (Tr. 340.)  Upon exam, Valenti had pain with all cervical movement and some limitation in cervical range of motion, but no gross deficits in strength or range of motion of his upper extremities. (Tr. 340-42.)  He was instructed in a home exercise program. (Tr. 341.)  In May, Valenti rated his neck and back pain as a "five." (Tr. 428.)

In May 2008, Valenti began working full time as an office manager for an attorney's

office. (Tr. 57, 189-203.)

On June 24, 2008, Valenti underwent a right carpal tunnel release. (Tr. 270-73.) At a post-op visit the following month, Valenti complained of chronic neck and low back pain, mixed bilateral arm pain, and occasional numbness and tingling in his leg. (Tr. 274.) The physician noted that Valenti had normal sensation, muscle tone, and strength. (Tr. 275.) Valenti was prescribed Hydrocodone for pain and referred to physical therapy. (Tr. 274-76.) In July 2008, Valenti rated his back pain as a "nine." (Tr. 418.) His cervical rotation and lumbar flexion and rotation were limited by pain. (Tr. 418.)

In February 2009, Valenti rated his chronic pain "all over his body" as an "eight." (Tr. 403-04.) He was taking Hydrocodone and requested pain management services. (Tr. 403.) He was diagnosed with spinal stenosis, as evidenced by an MRI, and arthralgias. (Tr. 405.)

In July 2009, after more than a year on the job, Valenti was terminated from his full-time job as an office manager after he objected to the attorney's representation of a client. (Tr. 57, 189-203.)

Also in July 2009, Valenti was seen by Dr. Jones, who noted diagnoses of joint pain and arthralgias, cervical stenosis, and other internal derangement of the knee. (Tr. 371-72.) He complained that his pain was worsening, rating it as a "seven." (Tr. 400.) A September 2009 physical therapy report indicated that Valenti received mechanical traction therapy for his spinal stenosis and that he complained of neck and lower leg pain. (Tr. 369.) Valenti's November 2009 health summary from the VA listed seven problems: joint pain (March 1999); hyperlipidemia (March 1999), spinal stenosis (February 2008), internal derangement of knee (February 2008), myopia (April 2008), presbyopia (April 2008), and carpel tunnel syndrome (August 2009). (Tr.

367-68.)

In August 2009, Valenti saw a physical therapist for pain in his neck, right upper extremity, and right knee. (Tr. 387.) He stated that his cervical pain was constant, rating it as a "five," and that he had headaches "almost all day." (Tr. 388.) His pain increased with physical activity and decreased when lying down. (Tr. 388.) He was also fitted with a left wrist splint for carpal tunnel syndrome of moderate severity. (Tr. 391, 394.)

In December 2009, J. Gange, Ph.D., a state agency psychologist, reviewed Valenti's record and concluded that there was insufficient evidence to make a disability determination for an alleged DIB onset date of December 31, 2006. (Tr. 353-65.) His opinion was later affirmed by a second state agency psychologist, Kenneth Neville, Ph.D. (Tr. 480.) That same month, Dr. R. Fife, a state agency physician, likewise concluded that there was insufficient evidence to make a disability determination as of Valenti's date last insured. (Tr. 479.) His opinion was later affirmed by another state agency physician, Dr. J. Sands. (Tr. 481.)

In January 2010, Valenti reported upper extremity weakness, numbness, and pain, together with significant pain in his back and knees. (Tr. 517.) In February 2010, Valenti asked Dr. Jones for a "statement of disability for Social Security stating he has been disabled since Dec[ember] 2006 and [that his] condition is not expected to change." (Tr. 515.) Accordingly, Dr. Jones wrote a second letter addressed "to whom it may concern," stating that Valenti had been seen in the VA system since 1999 due to joint pains; that he became Valenti's doctor in August 2007; and that Valenti suffered from multiple musculoskeletal pains, including cervical stenosis, right knee pain, right shoulder pain, and lumbar strain. (Tr. 164.) Dr. Jones elaborated that Valenti had undergone right carpal tunnel release with little improvement in numbness and

weakness, that no other surgeries were recommended, and that physical therapy offered him only little improvement. (Tr. 164.)  Dr. Jones opined that "it would be difficult for [Valenti] to gain employment." (Tr. 164.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On January 7, 2011, the ALJ issued the decision that ultimately became the

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Commissioner's final decision. (Tr. 23-33.)  He found at step one that Valenti had engaged in substantial gainful activity from May 2008 to July 2009, working as an office manager for an attorney during that period.  Nevertheless, the ALJ proceeded to step two, explaining that he would consider Valenti's work activity when assessing the credibility of his symptom testimony. (Tr. 25-26.)

At step two, the ALJ found that Valenti did not have a severe impairment prior to his date last insured. (Tr. 26.)  In the alternative, the ALJ concluded that even if Valenti's right knee pain due to suspected anterior cruciate ligament deficiency was a severe impairment, his impairment or combination of impairments was not severe enough to meet a listing. (Tr. 29.)

Continuing on in the alternative, the ALJ assigned Valenti the following RFC as of his date last insured:

> [T]he claimant would have the residual functional capacity to perform []
> sedentary work (lift, carry, push, pull 10 pounds at most, sitting 6 out of an 8-hour
> work day, standing and walking 2 hours in an 8-hour work day) . . . with
> additional limitations that the claimant: could have occasionally performed
> climbing of ramps and stairs, balancing, kneeling, stooping and crouching; could
> have performed no frequent reaching out from the body; and no overhead
> reaching; and, required a sit/stand option where the claimant could change
> position occasionally throughout the work-day, but still pay attention to the task
> at hand.

(Tr. 29.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded in the alternative that Valenti was able to perform his past relevant work as an office manager through his date last insured, as well as a significant number of other semi-skilled jobs such as receptionist (400 jobs regionally), appointment clerk (200 jobs regionally), and production clerk

(200 jobs regionally).[6] Accordingly, Valenti's claim for DIB was denied. (Tr. 33.)

### C. The ALJ Fairly and Fully Developed the Record

First, Valenti contends that his waiver of the right to counsel was invalid and that the ALJ failed to fully and fairly develop the record. Ultimately, neither of these assertions have merit.

#### 1. Waiver of Counsel

To ensure a valid waiver of counsel, the ALJ must explain to a *pro se* claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of fees." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994)); *see also Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991). Here, the ALJ fulfilled these three requirements through various papers sent to Valenti by the Social Security Administration prior to the hearing, including a written waiver of counsel that Valenti signed (Tr. 113-14, 128), and through statements he made to Valenti at the beginning of the hearing (Tr. 40-44). Thus, Valenti's contention that the ALJ did not obtain a valid waiver is quickly disposed of.

#### 2. Development of the Record

Valenti's assertion that the ALJ failed to fully and fairly develop the record is equally unsuccessful, as he does not demonstrate "prejudice or an evidentiary gap" in the record. *Binion*, 13 F.3d at 245. "Prejudice may be demonstrated by showing that the ALJ failed to elicit all of

---

[6] The ALJ mistakenly recited in his decision that there were 200 receptionist jobs regionally, but the vocational expert actually testified that there were 400. (*Compare* Tr. 32, *with* Tr. 91.)

the relevant information from the claimant." *Id*. (citation omitted). But courts "generally respect the [ALJ's] reasoned judgment" with respect to how much evidence to gather, *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994), and thus a significant omission is usually required before a court will find that a remand is warranted, *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). In other words, "the omission must be prejudicial." *Id*.

Here, Valenti does not allege that the ALJ failed to elicit relevant testimony from him at the hearing, and wisely so, as the ALJ questioned Valenti at length about his background, activities, treatment, and problems causing disability. (Tr. 48-88.) In fact, when the ALJ asked Valenti at the close of the hearing if there was anything he thought the ALJ had overlooked or that he thought the ALJ should know, Valenti responded: "No, I believe you have been pretty thorough here sir." (Tr. 87.)

Rather, Valenti contends that although he submitted his records from the VA at the hearing, "these records appear incomplete," as "there is scant medical evidence prior to the expiration of the date last insured in 2006." (Pl.'s Reply 1.) He suggests that since he sought ongoing medical treatment that led to a VA rating for a service-connected disability, "it stands to reason that there was medical evidence available to that agency to render a decision." (Pl.'s Reply 1.)

But "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelson*, 131 F.3d at 1235 (quoting *Binion*, 13 F.3d at 246). Furthermore, Valenti's speculation is belied by the evidence of record. To explain, Valenti stated at the hearing that he had "very little if any medical attention" between 1994 and 1999. (Tr. 63.) And in February 2007, Valenti told the VA that he had not seen a physician in

"quite some time" because he did not have insurance. (Tr. 383.)  Similarly, in July 2007, the VA physician noted that Valenti had not been followed by any physician for his complaints and that there were *no* records for any examination or treatment after his release from active duty. (Tr. 379, 381.)

Moreover, Valenti had obtained counsel by the time he filed his reply brief.  Yet, even with assistance from counsel, Valenti fails to produce any additional VA records and advocate to the Court for a sixth sentence remand to consider such "new" evidence.  A claimant who is represented by counsel is assumed to have advanced his "strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).  Thus, Valenti's argument that a remand is required because the ALJ failed to obtain additional VA records is unpersuasive.

### D.  The ALJ's Rejection of Dr. Jones's Opinion Is Supported by Substantial Evidence

Next, Valenti argues that the ALJ improperly rejected Dr. Jones's February 2010 opinion, stating that "it would be difficulty for him to gain employment." (Tr. 164.)  But the ALJ's reason for failing to adopt this opinion is easily traced.

A claimant is "not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(d)(1).  The determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. § 404.1527(d)(1); SSR 96-5p.  In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006); 20 C.F.R. § 404.1527(d)(3).  "Giving controlling weight to such opinions would, in effect, confer upon the treating source the

authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ penned an entire paragraph about Dr. Jones's opinion, explaining that his statement was "conclusory" and an "an opinion on an issue reserved to the Commissioner," and thus, could not be afforded controlling weight. (Tr. 31); *see Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) (rejecting physician's opinion that claimant was "unable to work gainful employment because of his chronic neck [pain], left arm pain and low back pain," explaining that it was "not conclusive on the ultimate issue of disability, which is reserved to the Commissioner"); *Dixon*, 270 F.3d at 1177.

The ALJ then considered the opinion in accordance with the factors specified in 20 C.F.R. § 404.1527(c). In doing so, the ALJ observed that Dr. Jones had only begun treating Valenti in August 2007, eight months *after* his date last insured; that Dr. Jones cited little objective evidence in support of his severe opinion; and that the opinion was "inconsistent with the evidence of record as whole" (Tr. 31)—all worthy reasons for discounting a physician's opinion; *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("An ALJ must offer good reasons for discounting the opinion of a treating physician.") (citations and internal quotation marks omitted); *Smith*, 231 F.3d at 441 (discounting a treating physician's opinion where it lacked the support of objective evidence and was inconsistent with other substantial evidence of record). Furthermore, Dr. Jones's opinion was rendered in February 2010, *more than three years* after Valenti's date last insured, and it speaks only to Valenti's current condition, making no attempt to opine about his physical condition in December 2006. *See Wright v. Astrue*, No. 08-

cv-231, 2008 WL 4829950, at *11 (W.D. Wis. Oct. 27, 2008) (affirming the ALJ's rejection of certain medical opinions that postdated the claimant's date last insured and assessed limitations only as to the claimant's current condition); *see also Stewart v. Astrue*, No. 1:08-cv-209, 2009 WL 1766841, at *6 (N.D. Ind. June 23, 2009).

In sum, the ALJ constructed an accurate and logical bridge between the evidence and his decision to assign no weight to Dr. Jones's conclusory opinion, which is all that the ALJ is required to do. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning.") (citation and internal quotation marks omitted). The Court will not accept Valenti's plea to reweigh Dr. Jones's opinion at this juncture. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence"). Accordingly, Valenti's second argument does not warrant a remand of the Commissioner's final decision.

### E. The ALJ's Credibility Determination Will Not Be Disturbed

Valenti also argues that the ALJ improperly discounted the credibility of his symptom testimony by assigning too much weight to his daily activities. Valenti's argument, however, does not merit overturning the ALJ's credibility determination.

"An ALJ is in the best position to determine the credibility of witnesses, and we review that determination deferentially." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citing *Sims v. Barnhart*, 442 F3d 536, 538 (7th Cir. 2006)). "We overturn a credibility determination only if it is patently wrong." *Id.* (citing *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006)).

"The finding must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.* (citing *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007)).

Here, the ALJ discounted the severity of Valenti's subjective symptoms for several reasons, including that he received only minimal treatment for his complaints prior to his date last insured and the treatment was "essentially routine and conservative in nature." (Tr. 30); *see Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (explaining that the Social Security regulations expressly permit the ALJ to consider a claimant's treatment history); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative"); 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *7. The ALJ observed, for example, that although Valenti complained of migraine headaches, they were relieved by anti-inflammatories and muscle relaxants. (Tr. 29.) Similarly, the ALJ noted that the only surgery Valenti had undergone was a right carpal tunnel release and that providers instead recommended physical therapy and home exercises for his back, knee, and shoulder complaints. (Tr. 30.)

Also, the ALJ emphasized that medical findings prior to Valenti's date last insured were "minimal," highlighting that his examination in March 1999 revealed no swelling, redness, or limitation in motion of his right knee. (Tr. 28.) "[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility." *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000); *see Arnold*, 473 F.3d at 823 ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."). "It is axiomatic that the

claimant bears the burden of supplying adequate records and evidence to prove [his] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c)). "The relevant inquiry is whether [Valenti's] pain was of a disabling severity during the relevant period," not that he was diagnosed with various medical conditions prior to his date last insured. *Leon v. Astrue*, No. 1:11-cv-268, 2013 WL 796310, at *10 (N.D. Ind. Mar. 4, 2013) (citing *Betancourt v. Apfel*, 23 F. Supp. 2d 875, 879 (N.D. Ill. 1998)).

Valenti does not particularly challenge the ALJ's citing of the foregoing medical evidence in connection with his credibility determination. Rather, as explained above, Valenti suggests that the ALJ improperly considered his activities of daily living when assessing the credibility of his symptom testimony. He contends the ALJ overlooked the fact that any activities he performs "are done with limitation, and accompanied by severe pain." (Pl.'s Br. 3.)

Of course, the ALJ is entitled to consider a claimant's daily activities as a factor when assessing the credibility of his subjective complaints, *see Schmidt*, 395 F.3d at 746-47; 20 C.F.R. § 404.1529(c)(3); SSR 96-70, 1995 WL 374186, at *3, and here the ALJ's consideration is supported by the record. The ALJ correctly observed that Valenti's wife represented that he has no problems with performing his own self care and that he also cared for his infant grandson and the household pets; performs household tasks such as laundry and meal preparation; and regularly goes shopping, to legion meetings, and to play cards with friends. (Tr. 28 (citing Tr. 204-10).) In doing so, the ALJ also recognized Valenti's report that he rests frequently, alternates between sitting and standing, and that his pain increases with activity. (Tr. 27-28.)

The ALJ also considered that Valenti was able to complete an associate degree in criminal justice online and planned to pursue his bachelor's degree. (Tr. 30.) Similarly, the ALJ

found it significant that Valenti worked as an office manager for an attorney for almost a year after his date last insured and that the job ended because of a difference of opinion, *not* because of impairment-related symptoms.[7] (Tr. 30); *see Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that he could perform work cuts against his claim that he was totally disabled."); *Steward v. Bowen*, 858 F.2d 1295, 1302 (7th Cir. 1988).

And when considering Valenti's activities, the ALJ did not go so far as to improperly equate them with an ability to work full time. Rather, he reasonably observed that the activities were, at least at times, "somewhat greater than [Valenti] had generally reported." (Tr. 30; *see* Tr. 28); *compare Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility), *and Scheck*, 357 F.3d at 703, *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).

In sum, the ALJ appropriately considered the credibility of Valenti's symptom testimony in accordance with the factors identified in 20 C.F.R. § 404.1529(c) and ultimately determined that his symptoms were not of disabling severity as of his date last insured. In doing so, the ALJ built an accurate and logical bridge between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2009). Accordingly, the ALJ's credibility determination, which is entitled to special deference, *Powers*

---

[7] Valenti also asserts that the ALJ erred by misstating his 2009 income at step one when he recited that Valenti had earned $10,186 in 2009, rather than $8,840 as the record reflects. (*See* Tr. 137.) But the ALJ did not deny Valenti's claim at step one on the basis of substantial gainful activity; rather, he continued on with the five-step sequential analysis, explaining that he would consider Valenti's work activity when assessing the credibility of his symptom testimony. (*See* Tr. 25-26.) Therefore, Valenti's argument that the ALJ committed reversible error at step one is unavailing.

*v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000), will not be overturned.

### F. The RFC Assigned by the ALJ Is Supported by Substantial Evidence

In addition, Valenti claims that the ALJ erred when assigning an RFC that incorporated upper extremity reaching limitations, rather than reaching limitations *and* hand and finger limitations. Again, Valenti's argument lacks traction.

The RFC is a determination of the tasks a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 404.1545.

Here, no medical source of record assigned Valenti any specific upper extremity limitations. Furthermore, the ALJ ultimately assigned Valenti an RFC consistent with his hearing testimony about his upper extremity limitations. In that regard, Valenti testified that although his hands at times "go numb like the pins and needles sensation" due to his carpal tunnel syndrome (Tr. 68), his problems centered on reaching with his arms, rather than gripping or manipulating objects (Tr. 78-79). Valenti represented that he could lift ten pounds; hold a pen and sign his name; pick up keys and small items; turn a doorknob; and provided that he first wet his fingertips, pick up a hairpin from a tabletop. (Tr. 79.) He also testified that he regularly works on a computer, picks up his infant grandson, loads the dishwasher, and worked as an office manager for almost a year after his date last insured, undercutting any assertion of

disabling hand and finger limitations. (Tr. 80, 83-84, 86.)

In light of the evidence of record, the ALJ's reasoning is easily traced concerning his formulation of an upper extremity RFC restricting Valenti from "frequent reaching out from the body" and all "overhead reaching," but no finger or hand limitations. (Tr. 29.)  Consequently, the ALJ has done enough in this instance. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005) ("In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion.").  The RFC determination is the responsibility of the ALJ, 20 C.F.R. § 404.1546(c), and the Court will not "reweigh the evidence or substitute our own judgment for that of the ALJ," *Hayne*s, 416 F.3d at 626.

### G.  Valenti's Step Five Argument Is of No Moment

Finally, Valenti argues that the 800 representative jobs in the region and 8,000 jobs in the state that the ALJ identified at step five do not constitute a significant number of jobs that a hypothetical individual with Valenti's age, education, experience, and RFC could perform.  He contends that he was "not aware that [he] could object to these numbers" at the hearing. (Pl.'s Br. 3.)

Of course, Valenti's step-five argument is of no moment since the ALJ also found at step four that he could perform his past relevant work as an office manager both as it is generally performed and as actually performed by Valenti, directing a conclusion that Valenti was not disabled. (Tr. 31.)  Thus, the ALJ did not even have to proceed to step five.

And in any event, courts have found that fewer than 800 jobs in the region constituted a significant number of representative jobs at step five. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (acknowledging that as few as 174 jobs has been held to be significant and that it

is well-established that 1000 jobs is a significant number); *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (collecting cases finding 1350, 1266, 850-1000, 174, 500, and 675 jobs to be a significant number); *Forrester v. Astrue*, No. 1:10-cv-137, 2011 WL 4601146, at *7 (N.D. Ind. Sept. 30, 2011) (finding that 325 jobs in the region, and five or six times that many in the state was a significant number); *Coppernoll v. Astrue*, No. 08-cv-382, 2009 WL 1773132, at *10 (W.D. Wis. June 23, 2009) ("Although there is no statutory floor for what constitutes a 'significant number' of jobs, courts have found that even fewer than 750 available positions amounts to a significant job base."); *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ind. 1990) (finding 675 jobs was a significant number), *aff'd*, 936 F.2d 575 (7th Cir. 1991). Accordingly, Valenti's final argument also fails to warrant a remand of the Commissioner's final decision.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Valenti.

SO ORDERED.

Enter for this 2nd day of December, 2013.

S/Roger B. Cosbey                      
Roger B. Cosbey,
United States Magistrate Judge